**1.—Bribery—Policeman—Indictment—Surplusage—Election by State.**

Where the phraseology in an indictment for bribing a policeman, with reference to other persons and places, could be treated as surplusage, and none of these matters were submitted in the charge of the court and amounted to an election by the State, there was no reversible error in overruling the motion to quash.

**2.—Same—Duty of Policeman to Report Offenses and File Complaints.**

The whole theory and purpose of our laws is that the peace officers, including policemen of cities, shall do everything and all things necessary and proper to prevent, suppress, and punish crime, and where the indictment for bribery of a policeman alleged that said bribe was made to induce and influence the said officer not to arrest and report and file complaint against the defendant for retailing liquor without license, etc., the same charged an offense under the different articles of the Code cited in the opinion of the court. Davidson, Presiding Judge, dissenting.

**3.—Same—Disjunctive—Conjunctive—Indictment.**

Where the indictment for bribing a policeman specifically alleged that the defendant directly and indirectly kept, etc., the objection that the disjunctive "or" was used in the indictment was untenable.

**4.—Same—Indictment—Future Offense.**

Although the objection that the indictment charged that the defendant intended in the future to keep a house for retailing intoxicating liquors without license was not well taken, yet, if it did so allege, the same did not invalidate the indictment, as the bribe could relate to a future offense as well as a present one.

**5.—Same—Bribing Officer—Indictment.**

The gist of this offense on the part of the briber is his corrupting or attempting to corrupt an officer in the discharge of his duty, whether that duty is as to something past, present or future, and it is no defense that the defendant has never received the fruits of his crime; and, where the indictment was in substantial conform'ty to approved precedent, the same was sufficient under the different articles of the Penal Code, quoted in the opinion of the court. Davidson, Presiding Judge, dissenting.

**6.—Same—Indictment—Police Officer.**

Where, upon trial of bribing a policeman of a city, the indictment followed approved precedent, it was not necessary to allege that defendant had committed an offense for which he could bribe an officer not to arrest him, nor what the duties of a policeman were as an officer. Following Smalley v. State, 59 Texas Crim. Rep., 95. Davidson, Presiding Judge, dissenting.

**7.—Same—Sufficiency of the Evidence—Accomplice—Charge of Court.**

Where, upon trial of bribing a policeman of a city, the evidence showed that the defendant bribed said policeman not to arrest him, inform on him, or file complaint against him for running a liquor house without license, as alleged in the indictment, and further showed that the officer did not originate or induce defendant to bribe him, but simply acted so as to catch the defendant and obtain sufficient evidence to convict him, this did not make the policeman an accomplice, and the court was not required to so charge the jury. Davidson, Presiding Judge, dissenting.

**8.—Same—Charge of Court—Harmless Error.**

Where, upon trial of bribing a policeman, the evidence did not raise the issue of accomplice, but the court, nevertheless, submitted a charge thereon, the defendant could not complain.

**9.—Same—Charge of Court—Ownership.**

Where, upon trial of bribery of a policeman for not arresting, etc., defendant for keeping a disorderly house, the defendant's testimony as to the ownership of said house was brought out on cross-examination, there was no error in the court's failure to single out such testimony in his charge.

**10.—Same—Requested Charge.**

Where the defendant's requested charge with reference to defendant's declaration that he expected the officer to do his duty was on the weight of the evidence, there was no error in refusing to submit the same.

**11.—Same—Charge of Court—Definition of Bribery.**

Where, upon trial of bribing a policeman, the court submitted every essential element contained in article 193, Penal Code, defining bribery, together with the reasonable doubt, the same was sufficient without specifically quoting said definition.

**12.—Same—Bribery—Offense Defined—Accepting Bribe—Intent.**

The offense of bribery under the statute does not require a mutual or reciprocal agreement to commit this offense, but the giver of a bribe is guilty of such offense if he acts corruptly to influence the officer, although the latter may receive the same without such intent, and the contention that it is a legal impossibility for one man to commit bribery without the acceptance of the bribe by another is untenable.

**13.—Same—Sufficiency of the Evidence.**

Where, upon trial of bribery of a policeman in corruptly intending to influence him not to make arrests, etc., of defendant for retailing liquors without

license, the evidence sustained the conviction, there was no error. Davidson, Presiding Judge, dissenting.

### 14.—Same—Accomplice—Officer—Detective—Rule Stated.

Where an officer or other party understands or is led to believe that a violation of the law is in contemplation and takes steps to detect that crime, or to get evidence by which the guilty party may be punished, he is not an accomplice, as he does not bring about the crime. Following Bush v. State, 151 S. W. Rep., 554.

### 15.—Same—Accomplice—Rule Stated.

An accomplice is a person who knowingly, voluntarily and with common intent with the principal offender unites in the commission of the crime.

### 16.—Same—Sufficiency of the Evidence—Case Stated.

Where, upon trial of bribing a policeman with the intention of inducing him not to arrest defendant for the retail of intoxicating liquors without license, etc., the evidence showed that said policeman and another officer went into said transaction as officers with the intention of securing the arrest and conviction of the defendant for said offense of bribery, and did not originate the offense, they were not accomplices, and the conviction was sustained. Distinguishing Devers v. State, 37 Texas Crim. Rep., 396. Davidson, Presiding Judge, dissenting.

Appeal from the Criminal District Court of Dallas. Tried below before the Hon. Barry Miller.

Appeal from a conviction of bribery of a policeman; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

*Walter F. Seay, M. T. Lively, W. W. Nelms* and *Jed C. Adams,* for appellant.—

From a reading of the indictment it will be seen that it attempts to predicate bribery upon paying money to a police officer to refrain from filing complaints or making arrests in the event that some time in the future this defendant or some other person should attempt to set up a gambling house or to retail liquor contrary to the law. There is no allegation as to what the duties of police officers in the City of Dallas are, and we can not see how bribery could be predicated upon something that might or might not occur in the future or until it is shown that it was the duty of an officer bribed to perform the acts which it is alleged he was bribed not to perform. Even if the officer knew or believed that some time in the near future there would be a gambling house or a place established for the illegal sale of liquor, what could he ask a police officer without any legal process or papers to legally do? We know of no law requiring a police officer to file a complaint against a man that he suspicions has or is perhaps going to permit gambling and the sale of liquor illegally and certainly for either offense a police officer has no legal right to arrest, unless he has a warrant or other legal process, neither of the said offenses being a breach of the peace which would permit an arrest, even if committed, without a warrant.

Where the evidence discloses that although the defendant may have

made some remarks indicating that he might desire to bribe the two police officers, and that he desired to see them separately about the matter, but that instead of the transaction being consummated as he intended, it was carried into effect in the manner and in the way that the officers previously determined on, and not as the defendant had intended, then it was not bribery. O'Brien v. State, 6 Texas Crim. App., 665; Love v. People, 32 L. R. A., 139; Speiden v. State, 3 Texas Crim. App., 156; Connor v. People, 25 L. R. A., 341.

Our contention is that irrespective of the intent of the officers that it is an utter impossibility for a man to commit the offense of bribery by himself; just as impossible as to commit the crime of conspiracy. There must be the giver and the acceptor. In a burglary case, although the owner may act with the best of motives, if he even impliedly gives his consent to the entry, the offense of burglary can not be committed. A want of consent is a part or parcel of the crime. If in law these men did not accept the bribe, then the bribery was not complete and not committed, and as the record stands in this case we have a man committing bribery by himself.

Where the evidence raises the issue as to whether or not the prosecuting witnesses in a bribery case encouraged the defendant by their words and conduct to consummate the offense charged, if any, which conduct and acts on their part made them accomplices under law, then the court should instruct the jury that if such were the case that this made them accomplices and there being no pretended corroboration, then they should acquit the defendant if they so find and believe.

If officers, by act or conduct, aid or encourage defendant to commit an offense, and but for their aiding and encouraging him to commit such offense in order to catch him, and that if such offense would not have been committed except by the encouragement and aid of said officers for the purpose of catching and prosecuting the said defendant, then they are accomplices at best and a verdict of not guilty should be instructed where there is no pretense of corroboration. Morawitz v. State, 80 S. W. Rep., 997; Ruffin v. State, 38 S. W. Rep., 169; Collins v. State, 51 S. W. Rep., 216.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, Judge.—Appellant was convicted of bribery of a policeman in Dallas, Texas, and his penalty fixed at four years in the penitentiary.

Appellant has many bills of exception, and many complaints of the indictment, the charge of the court, the refusal to give his special charges and other matters. Although we have considered all of his complaints, we deem it unnecessary to take them up separately and discuss them. His attorneys have filed a forcible brief, and made an able oral argument, wherein he presents, as we take it, all the material questions

necessary to a correct decision of this case. We will undertake to state, discuss and decide these questions so presented.

The first count in the indictment, on his motion, was quashed by the court below. Any statement with reference thereto is, therefore, unnecessary. We will copy the second count which alone was submitted and on which appellant was convicted. After the necessary formal allegations thereof, charging the offense to have been committed in the City of Dallas on or about August 5, 1911, it alleges that appellant "did then and there unlawfully and corruptly offer to bribe and did bribe Joe Davis, a duly and legally qualified policeman in the City of Dallas, in Dallas County, Texas, and a peace officer of said city, county and State, and the said Jim Minter did then and there unlawfully, wilfully and corruptly offer to give and pay and did give and pay as a bribe to the said Joe Davis, the sum of $15, which then and there passed current as money of the United States of America of the value of $15, with the intent and purpose on the part of him, the said Jim Minter, to then and there induce and influence the said Joe Davis in violation of his official duty as such peace officer to not arrest and report and file complaint against him, the said Jim Minter, and any other person and persons for unlawfully keeping and being interested in keeping, and in case they, the said Jim Minter, and such other person and persons, and either of them should keep and be interested in keeping for the purpose of gaming, certain premises, building, room and place there situate, as a place to bet, wager and gamble with dice and cards and at and upon games played with dice and cards, and as a place to which people resorted and would resort and were to resort to gamble, bet and wager with dice and cards and at and upon games played with dice, cards, and with the intent and purpose then and there on the part of him, the said Jim Minter, to induce and influence the said Joe Davis as aforesaid unlawfully and corruptly and in violation of his official duty as such peace officer to not arrest and report and file complaint against him, the said Jim Minter, and any other person and persons, for unlawfully and directly and indirectly keeping and being concerned in keeping a certain house at No. 3121 Cochran Street, in the City of Dallas, in Dallas County, Texas, as a house where spirituous, vinous and malt liquors were sold and kept for sale, and to be sold and kept for sale, in quantities of one gallon and less than one gallon, capable of producing intoxication, in a certain locality in said county and State other than where local option was then and there in force, without having obtained a license under the laws of the State of Texas to retail such liquors, against the peace and dignity of the State."

His attacks on this indictment succinctly and substantially stated are: 1. It charges no offense under the laws of Texas. 2. It is indefinite, vague, ambiguous and unintelligible, and appellant is not thereby apprised of the charge against him with sufficient clearness so that he can prepare or present his defense thereto. Wherein or how it is defective in any or all of these particulars is not stated in this ground of his

motion. 3. It fails to allege that he ever committed any offense for which he could bribe an officer to not arrest him. 4. It does not allege what duties the officer had to perform nor what the legal duties of the officer were. 5. This ground is quite lengthy and somewhat mixed. As we understand it, he claims that in the first count it charges that he paid a bribe to Davis and Thompson; and in the second, that he paid a bribe to Davis to induce and influence Thompson and Davis to corruptly violate their official duties as peace officers and to not arrest, report and file complaint against him ("and any other person or persons") for unlawfully keeping and being interested in keeping a certain gaming house and a certain place where intoxicating liquors were sold in violation of law, because the law does not require police officers to report and file complaints against anyone whether they have violated the law or not and does not allege that said officers would be officers on the happening of such contingency.

And that the allegations in both counts which charge him with delivering a bribe to the parties to induce and influence Davis and Thompson to not report and file a complaint and arrest him ("and any other person or persons") if he should keep and be interested in keeping for the purpose of gaming, certain premises, building, room and place there situate as a place to bet, wager, and gamble with dice and cards, because said allegation is vague, and ambiguous, unintelligible, relates to some future happening or event as to which no officer could possibly have any official duty to perform, and it does not allege that said officers would be such officers on the happening of said alleged contingency.

As to this, what is alleged in the first count can and does have nothing to do with the second count. As to the allegation in the second, where it charges, "and any other person or persons," is surplusage, especially as the court in his charge did not embrace any other person or persons other than appellant himself. And what is alleged about the place being kept, etc., as a gaming place is also excluded and properly treated as surplusage in the submission of the case by the court to the jury. As none of these matters were submitted by the court to the jury but treated as surplusage, or amount to an election, they can not and do not affect the other questions which were submitted and which alone were submitted by the court in his charge.

In his other attack under this ground of his motion, his complaint is that the allegations in both counts that he delivered a bribe to Davis and Thompson to corruptly induce them to not arrest and report and file a complaint against him ("and any other person or persons") for unlawfully and directly *or indirectly* keeping and being concerned in keeping a house at a certain number and street in said city as a house where spirituous, vinous and malt liquors were sold and kept for sale, because said allegations affirmatively (we take it he means do *not* affirmatively) charge any offense against the law and does not affirmatively name the other person or persons that said officers were not to arrest and report and file complaints against, because there is no duty incum-

bent upon a police officer to report and file complaints against any person under conditions as set out in said allegation. And because said allegation, if it does affirmatively charge a violation of the law, is defective in that it charges him (and the other persons not named) with keeping, directly *or* indirectly, when such an act did not constitute an offense. What we have said above about the other paragraph of this ground of his motion is equally applicable to this. The indictment does not charge him with unlawfully and directly *or indirectly* keeping, etc., but specifically charged that he directly *and* indirectly kept, etc.

Our law (P. C., art. 496), among other definitions, defines a disorderly house as "any house in which spirituous, vinous or malt liquors are sold or kept for sale, without first having obtained a license under the laws of this State to retail such liquors." And also in the same article as "any house located in any county, justice precinct or subdivision of a county in which the sale of intoxicating liquor has been legally prohibited, where the owner, proprietor or lessee thereof has posted license issued by the United States of America, authorizing such owner, proprietor or lessee thereof to pursue the occupation and business of a retail liquor dealer or a retail malt liquor dealer." Then article 500, Penal Code, specifically makes it an offense for any person, directly or as agent for another, or through any agent, to keep or be concerned in keeping or aid or assist, or abet in keeping a disorderly house in any house, building, edifice or tenement, or to knowingly permit the keeping of a disorderly house in any house, building, etc., owned, leased, occupied or controlled by him directly or as agent for another or through any agent. Then article 506, Penal Code, of this chapter on these offenses, specifically enacts that "policemen of towns and cities are especially charged diligently to discover and report to the proper legal authorities, and by all lawful means to aid in the enforcement of the law for all violations of the articles of this chapter"; and requires the district judges to give said laws in charge to the grand jury, and requires the grand jury at every term of the District Court to call before them each and all officers charged with the enforcement of said law "and examine them under oath touching their knowledge and information of violations thereof, and as to their diligence in their enforcement."

Again, our gaming law in articles 548 to 563, inclusive, denounces gaming, the keeping of any premises therefor, or permitting the keeping of any place therefor in practically any and every way. Then article 564 specifically enacts: "Whenever it shall come to the knowledge of any . . . police officer or other peace officer, by affidavit of a reputable citizen, or *otherwise,* that any of the provisions of this law are being violated, it shall be the duty of such officer to avail himself of all lawful means to suppress such violation."

Then, again, article 611, Penal Code, enacts: "No person shall, directly or indirectly, sell spirituous or vinous liquors, capable of producing intoxication, in quantities of one gallon or less, without taking out a license as a retail liquor dealer," and fixes the penalty for anyone

so violating said law. And subsequent articles of said chapter make many other offenses regarding the unlawful sale, etc., of intoxicating liquors where not authorized by law. Then in the same chapter, article 631, it specifically enacts that any peace officer "having knowledge of the violation of this chapter, shall report the same to the county attorney, who shall forthwith prosecute any person or persons violating the provisions of this chapter." Article 349, Penal Code, specifically enacts that a policeman of a city or town is a peace officer. So does article 43, Code of Criminal Procedure. Article 44, Code of Criminal Procedure, makes it the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose he shall use all lawful means. He shall in every case, where he is authorized by the provisions of this Code, interfere, without warrant, to prevent or suppress crime. He shall give notice to some magistrate of all offenses committed in his jurisdiction where he has good reason to believe there has been a violation of the penal law. He shall arrest offenders, without warrant, in every case where he is authorized by law in order that they may be taken before the proper magistrate or court and be brought to punishment. Article 261, Code of Criminal Procedure, prescribes: "The municipal authorities of towns and cities may establish rules authorizing the arrest, without warrant, of persons found in suspicious places, and under circumstances which reasonably show that such persons have been guilty of some felony or breach of the peace, or threaten, or are about to commit some offense against the laws." In fact, the whole theory and purpose of our laws are that the peace officers especially shall do everything and all things necessary or proper to prevent, suppress and punish crime.

8. The only other ground in appellant's motion to quash is that the allegations that he paid Davis and Thompson a bribe to induce them to not arrest and report and file complaints against him (and any other person or persons) for directly or indirectly keeping and being concerned in keeping a certain house in Dallas, naming it, where spirituous, vinous and malt liquors were to be sold and kept for sale, etc., because they are conflicting with the allegations immediately preceding the same in that one alleges that they did directly or indirectly keep, etc., where the last part of the allegation charges them with indirectly and directly intending to keep said house for said purposes.

As to this last grounds of complaint we think the allegations in said second count, together with what we have said above, clearly shows there is nothing in this to in any way invalidate said indictment. The allegation in said count containing the words "and any other person or persons" is properly treated by the court in his charge and submission to the jury as surplusage or an election. They can not and do not affect the validity of the indictment wherein it charges that appellant himself bribed the peace officer not to arrest, report and file a complaint against him. And the allegation in the first part of this count that he bribed them with the intent, purpose, etc., not to arrest him, etc., for

Vol. 70 Crim. 41.

keeping a gambling house was not submitted by the court in his charge to the jury and it likewise was properly treated as surplusage by the court in his charge.   But whether so or not, this count in the indictment did not charge that he did this *or* bribed them not to arrest and report him, etc., for keeping a gambling house but that he bribed them not to arrest him for directly and indirectly, etc., keeping said house as a house where spirituous liquors, etc., were sold and kept for sale without license.   We do not understand this count of the indictment to charge that the appellant intended in the future to keep such house.   But even if it should have so charged, it did not invalidate the indictment.   For he could bribe an officer not to arrest him for thereafter keeping such house, as well as for theretofore keeping it.   The allegations of the indictment, which we have quoted above, and the statutes we have quoted above, we think, clearly refutes appellant's contentions.

Under our law, Penal Code, article 174, if any person shall bribe any officer with intent to influence his act on any matter which may be brought before him in his official capacity, or to do any other act or omit to do any other act, in violation of his duty as an officer, he shall be punished.   Article 176, Penal Code, enumerates many officers who are included within article 174, and specifically states that all city, county and State officials are included.   Then article 189, Penal Code, prescribes if any person shall bribe any peace officer to do any other act contrary to his duty as an officer or to omit to do any duty incumbent upon him as an officer, he shall be punished, etc.   Article 193 enacts: "By a 'bribe,' as used throughout this Code, is meant any gift, emolument, money or thing of value, testimonial, privilege, appointment or personal advantage, or the promise of either, bestowed or promised for the purpose of influencing an officer or other person, such as are named in this chapter, in the performance of any duty, public or official, or as an inducement to favor the person offering the same, or some other person."   And article 194 enacts:   "The bribe, as defined in the preceding article, need not be direct; it may be hidden under the semblance of a sale, wager, payment of a debt, or in any other manner designed to cover the true intention of the parties.   The bribe, or the promise thereof, must precede the act which it is intended to induce the person bribed to perform."

The indictment follows substantially our statute denouncing bribery and is in substantial conformity to the approved forms thereunder.. Willson's Texas Crim. Forms (4 Ed.), pp. 35-6; 2 Whart. Prec. Ind., 1014.

Our statute (C. C. P., art. 466) says:   "An indictment, under the laws relating to bribery, shall be sufficient if it charges that the defendant bribed or attempted to bribe any officer or other person named in the Penal Code who may be subject to bribery, with intent to influence the action of such person."   Article 460 says:   An indictment "shall be deemed sufficient which charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common

understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged, and enable the court, on conviction, to pronounce the proper judgment." And article 453 is: "The certainty required in an indictment is such as will enable the accused to plead the judgment that may be given upon it, in bar of any prosecution for the same offense."

The gist of this offense on the part of the briber is his corrupting or attempting to corrupt an officer in the discharge of his duty, whether that duty is as to something past, present or future. The briber, so far as he is concerned, has committed the crime of bribery when he has corruptly, illegally and immorally done all that he could, and that is necessary for him to do, to induce an officer, corruptly and illegally, not to do his duty. It is no defense that he has never received the fruits of his crime and never will. In the recent case of Ex parte Shepherd, 153 S. W. Rep., 628, we had occasion to investigate this and kindred questions to those urged by appellant herein, and state some, and cite many cases. In that case Shepherd tried to avoid punishment for unduly attempting to influence a juror on the ground that said person was not a juror, or not a legal juror. We held it was immaterial whether or not he was a legal juror. That he was approached in that capacity, and "it would be a terrible doctrine, indeed, that would permit a person to approach one serving his county as a juryman and endeavor to corrupt him, and when tried for that offense permit him to justify his conduct on the ground that such person was not a legal juror." In Florez v. State, 11 Texas Crim. App., 102, this court, through Judge Hurt, said: "To hold that deputy sheriffs, constables, and jailers who have the custody of prisoners charged in a great many cases with capital felonies can be bribed to discharge the felons, and, when those guilty of the bribing are sought to be brought to justice and punishment, that they can plead that the custodians of prisoners were not in every particular legally appointed, would be a terrible doctrine, indeed. Moral obliquity obtains in the one case as well as the other. The injury to public justice being the same, the defense, if one at all, is strictly technical, without foundation, as we think, in principle, and evidently against justice."

In Moseley v. State, 25 Texas Crim. App., 515, where an officer was prosecuted for accepting a bribe to let a prisoner escape, defended on the ground that the prisoner had been illegally arrested, this court said: "It matters not whether the arrest and custody were legal or illegal, the said Gable was a prisoner in the custody of the defendant, a peace officer, and was permitted by the defendant to escape in consideration of money paid him to effect such escape. We are of the opinion that, in a prosecution for this offense, it is not permissible for the defendant to question the legality of his custody of the prisoner. Such an issue is irrelevant and immaterial. The moral obliquity of this offense is the same where the custody of the prisoner is illegal as where it is legal, and the injury to public justice is the same." See also the cases cited in the

Shepherd case, 153 S. W. Rep., 628. In Jackson v. State, 43 Texas, 421, the indictment charged that defendant offered to bribe a witness to avoid the service of legal process. The Supreme Court held that the indictment was not defective because it failed to allege that a subpoena or other process had previously been issued. In Scoggins v. State, 18 Texas Crim. App., 298, Judge Hurt, for the court, held that if the indictment charges that defendant offered a bribe to induce a witness to avoid a subpoena or other legal process it is not necessary for the indictment to allege the issuance of the subpoena or other process. See also Ruffin v. State, 36 Texas Crim. Rep., 565; Smalley v. State, 59 Texas Crim. Rep., 95; People v. Markham, 64 Cal., 157.

In accordance with these authorities, the indictment herein is not defective, in failing to charge, if it does, that appellant had committed an offense for which he could bribe an officer not to arrest him. Nor is it necessary for the indictment to allege what were the duties of the police officer. That is a matter of law.

The report of the evidence in this case on some points is rather meager, but after studying the whole carefully, we think it shows, and from it the jury were authorized to find and believe, that the City of Dallas had prohibited the sale of intoxicating liquors and prohibited license therefor outside of certain limits. And in said outside limits local option was not in force. That appellant at the time this offense is charged, August 5, 1911, and for some time prior thereto, had been directly, and if not directly, certainly indirectly, engaged in keeping and was interested in keeping, the house in said city described in the indictment, as a house where spirituous and malt liquors, capable of producing intoxication, were sold and kept for sale in quantities of one gallon and less, without any license. That Joe Davis and L. B. Thompson were policemen of said city and had on August 1, 1911, been changed from some other beat of said city to that where appellant and his said house was located. Davis and Thompson were kind of partners, or worked together, as policemen. The testimony of Davis especially, and Thompson, on the point of appellant bribing Davis is quite lengthy. It is unnecessary to give it to any length. From all of it, it is clear that appellant himself approached Davis and bribed him not to arrest him, inform on him, or file complaint against him for running his said place as a gaming house, and as a liquor house without license as alleged in the indictment, and to let him continue such businesses unmolested by said policemen while they were on that beat, without any suggestion or intimation by the policemen, or either of them, by word or act, to appellant that they were open to bribery. That when and after appellant made it clear and certain to Davis he wanted to bribe him and Thompson, all he or both of them did and said, was merely to catch him and obtain sufficient evidence to convict him, and for no other purpose. The evidence excludes the idea that Davis and Thompson, or either of them, originated, initiated or induced appellant to bribe Davis, or Thompson, or both of them.

In our opinion the evidence in no way showed, or tended to show, that both or either of said policemen were accomplices, and the court should not have submitted any charge on that subject. It is clear to us that said witnesses came within that line of decisions "which holds that where an officer or other parties understand or are led to believe that a violation of the law is in contemplation, and take steps to detect that crime, or get evidence by which the guilty parties may be punished, he would not be an accomplice, but in such cases he is not an original party to the bringing about the crime and is not guilty of originating or initiating it. In that character of case his connection with it is after the inception of the crime and after it has been determined upon, and he only then gets into it as a detective or for the purpose of arresting the party and bringing him to punishment." Bush v. State, 153 S. W. Rep., 556; Chisister v. State, 33 Texas Crim. Rep., 635; Smalley v. State, 59 Texas Crim. Rep., 95; Allison v. State, 14 Texas Crim. App., 122; Sanchez v. State, 48 Texas Crim. Rep., 591; Wright v. State, 7 Texas Crim. App., 574; Pigg v. State, 43 Texas, 108; Johnson v. State, 3 Texas Crim. App., 590; Clay v. State, 40 Texas Crim. Rep., 556; Spencer v. State, 52 Texas Crim. Rep., 289; 1 Wh. Cr. Ev. (10 Ed.), sec. 440.

It is clear from the record in this case and the charges requested by appellant that he insisted and urged in the lower court, and urges in this, that said witnesses Davis and Thompson were accomplices, and thereby induced the lower court to submit that question to the jury. It not being necessary or proper for the lower court to charge thereon, such charge, under the circumstances, did no injury to appellant, but was rather in his favor, and he can not complain thereof, whether they were corroborated or not.

The court did not err in singling out the evidence of Deputy Sheriff Sebastian as to appellant's *ownership* of said house and charging thereon as requested by appellant. His testimony brought out by the State tended strongly to show appellant was in charge of and running said house. There was testimony by several other witnesses to the same effect. His testimony of what appellant said about the *ownership* of the house was brought out by him on cross-examination. It is not proper to single out the testimony of any single witness and charge specially thereon. Wh. C. C. P., sec. 810, and cases cited.

The testimony of Davis shows that when appellant first approached him to bribe him, and later, too, appellant would tell him not to come in on him unawares, but let him know in advance so he could have parties in his place scatter and get out, and when the officer arrived things would apparently be all right, he would also say, "I expect you to do your duty." The court did not err in singling out this one expression and charging that the jury must take this to mean literally what it apparently expresses, as requested by special charges by appellant. It is perfectly apparent when all the testimony of what appellant said and in the same connection, he meant the reverse of what his said expression was. Appellant's requested charge would have clearly been on the

weight of the evidence and charged thereon, which can no more be done against the State than against appellant.  C. C. P., arts. 735-6, and authority last above cited.

While the court did not quote in his charge the definition of bribe as in article 193, Penal Code, yet, in submitting the case for a finding he required the jury to believe beyond a reasonable doubt every essential of bribery before they could convict appellant, and also charged on reasonable doubt, as is usual, and laid down by the statute.  This was all that was necessary.

In various ways appellant raised the question and urges that this conviction can not stand, because "it is a legal impossibility for one man to commit bribery.  There must be the giver and the acceptor of the bribe to constitute the offense."  The court charged: "But if you find beyond a reasonable doubt that the said Jim Minter is guilty of the offense of bribery, as the same has heretofore been defined to you, and you further find and believe beyond a reasonable doubt that the said Joe Davis and the said Lee Thompson, at no time, had any corrupt purpose in joining with said Jim Minter in the commission of said offense, but that the said Joe Davis and the said Lee Thompson went into said transaction with the said Jim Minter, if any occurred, originally as officers with the intention of securing the arrest and conviction of the defendant for such offense of bribery, if the same was committed by him, then they would not be accomplices, as the same has been herein defined."  Appellant's contention has been expressly held against him in able and clear opinions by courts of other States.  In Com. v. Murray, 135 Mass., 530, the Supreme Court of Massachusetts held:

"The substantive offense charged against the defendant was that of giving a gold coin to the justice of the .court, intending corruptly to influence his decision upon the complaints which were pending lawfully before him as a judicial officer; and was framed under the Pub: Sts., c. 205, sec. 9.  The defendant requested an instruction that the jury must be satisfied that the justice. received and accepted the same as a gift before the defendant could be convicted.

"The Pub. Sts., c. 205, sec. 9, provides, among other things, a punishment for him who corruptly gives, offers or promises to any judicial officer any gift or gratuity, with intent to influence his act, decision or opinion upon any matter pending before him in his official capacity; while section 10 of the same chapter provides a punishment for any judicial officer accepting such gift or gratuity, under the agreement or with an understanding that his opinion or judgment shall be given in any particular manner.  The contention of the defendant is, that a delivery of money or other valuable thing, with intent to influence a judicial officer, can not be treated as a gift, unless upon an acceptance of the same by him upon a corrupt agreement or understanding; and thus that there can be no conviction upon that clause of section 9 which relates to gifts corruptly made, unless those facts which make an offense on the part of the recipient can also be shown.  This is to construe the

statute too narrowly, and to make the guilt of one party in giving depend, not alone upon his own act and intent, but upon those of another.

"In Sulston v. Norton, 3 Burr., 1235, which was an action under the St. of 2 G. II, c. 24, sec. 7, which provided that 'If any person by himself, or any person employed by him, doth or shall, by any gift or reward, or by any promise, agreement or security for any gift or reward, corrupt or procure any person or persons to give his or their vote, he shall be subjected to a penalty of $500.' Lord Mansfield remarks: 'The offense was completely committed by the corruptor, whether the other party shall afterwards perform his promise, or break it.'

"In Henslow v. Fawcett, 3 A. & E., 51, which was an action on the same statute, Lord Denman, in commenting upon it, remarks: 'Procuring is one thing; it is essential that the vote should be given. Corrupting (which word is connected by the disjunctive particle) is another; it seems to me to lie altogether in the act of the party giving the bribe.' Mr. Justice Coleridge says: 'I am prepared to go the length of saying that, if it were clearly shown that Garner (the person who received the money) never intended to give the vote, concealing the intention from the defendant, and being so far moved by the defendant's act as to receive his money and conceal such intention, the defendant would be liable.'

"It is not essential to the defendant's crime that he should have induced the magistrate corruptly to receive his money. If he made a full and complete delivery of it, so that it was out of his possession and control and within that of the magistrate, with the corrupt intention on his part of influencing the decision of the magistrate, his offense is complete, although the magistrate received it in ignorance of what it was, and afterward retained it solely for the purpose of public justice."

The Supreme Court of Louisiana in State v. Dudoussat, 47 La. Rep., 977, held: "Bill No. 2 was reserved to a portion of the written charge, and is to the effect that the charge was erroneous, as it did not instruct the jury that to constitute the crime of receiving a bribe there must co-exist on the part of the giver and receiver of the bribe a corrupt intent—one to influence the other, and the other to be influenced to vote or to exercise official power or perform official duty with partiality or favor. The bill, in effect, denies that there can be a feigned accomplice in bribery, and, therefore, the theory upon which the conviction was had is incorrect. The indictment charges as though the prosecuting witness was an accomplice. The charge as to him may have been groundless; he may be innocent of the charge, but the question is, was the charge properly made against defendant? In other words, could he commit the crime of bribery without the co-operation of the defendant? Was the joint act of both necessary? The statute defining the offense is in the language of the article of the Constitution. It has a dual capacity. It charges two acts, and affixes to them the same designation and gives the same description, and imposes the same penalty; yet they are each distinct offenses.

"An analysis of the article of the Constitution and Act No. 78 of 1890 will show that it is made an offense to give a present or reward to any officer of the State or of a municipality with the intent to influence him in the discharge of official duty. Any officer so receiving such reward or present is also charged with the same offense—bribery. They are intimately associated, it is true, and the words, *so receiving,* would at first reading incline one to the opinion that there necessarily must be co-existent the giving and taking with the intent charged in the statute. The giver may tender with the intent to corruptly influence, and the acceptor may receive without such intent—the present or reward. Unquestionably, the giver would be guilty of a violation of the statute. And so the acceptor may take a present innocently tendered, yet if it should be proved that it influenced his official action, he would also be guilty of a violation of the statute.

"We are of the opinion that the statute does not require a mutual or reciprocal agreement to commit the crime of bribery." Com. v. Dietrich, 7 Pa. Sup. Ct., 515; 3 Bish. New Crim. Pro., sec. 127a; People v. Squires, 99 Cal., 327. After a careful search we have been unable to find any case or authority holding to the contrary. We follow the decisions of Massachusetts and Louisiana, supra, for they certainly decide the question correctly.

As stated above, we have not taken up and discussed each complaint of appellant separately, nor in the order presented by him, but have considered all of them. The questions we have discussed embrace all the material questions, however, raised or presented by appellant. The evidence is amply sufficient to sustain the verdict.

There being no reversible error the judgment will be affirmed.

*Affirmed.*

DAVIDSON, PRESIDING JUDGE.—I respectfully dissent.

ON REHEARING.

June 11, 1913.

PRENDERGAST, JUDGE.—While appellant, in his motion for rehearing again assigns and urges all the errors originally presented by him, he presses specially three points. First, that the indictment is bad and that his motion to quash should have been sustained. In the original opinion we discussed this sufficiently and are still of the opinion that without question the indictment is good. It is unnecessary to further now discuss this point.

Second, he urges that the policemen, Joe Davis and Lee Thompson, were accomplices.

Third, that it is a legal impossibility for one man to commit bribery; that there must be the giver and the acceptor of the bribe and the acceptor must accept with the intent and purpose of being corrupted, to constitute the offense.

We will further discuss these last two points. It is to be regretted that the opinion is already quite lengthy, but in order to properly present the questions, it will be necessary for us to give in detail the testimony, especially of the two policemen. We will give it substantially in full.

Joe Davis testified: "My name is Joe Davis. I am a police officer in the City of Dallas and have been such police officer about eight years. I know Lee Thompson, who is also a police officer in the City of Dallas. We were actually engaged in our duty on the 5th of August, 1911. I have known Jim Minter something like four or five years; knew him when I saw him; knew that he was Jim Minter, and that is all I knew about him. I know that his place is at 3121 Cochran Street, near the Central Railroad in the City of Dallas, Dallas County, Texas. I have had occasion to visit the place. . . . Well, on the first day of August, 1911, we were detailed on that beat, Mr. Thompson and myself, and we went up there and went to work on the evening of the 3d; well, Mr. Thompson was gone to supper. I was reporting from the Gamewell System, as we do every hour or two hours, whichever the beat may consist of, and I believe it was about 5 o'clock, probably a little after 5, when I was reporting from this box, and after I had rang in, as I turned around Mr. Minter stepped up to me and says: 'I have been trying to see you fellows since you have been put here for the last day or two.' He spoke as I turned around, he made these remarks. I was by myself and Mr. Thompson had gone to supper at this time. 'Well,' I says, 'we have been up here ever since the first.' 'Well,' he says, 'I want to run a little game down here and I want to fix you boys'; 'Well,' I says, 'fix us how?' 'Well,' he says, 'I want to treat you like I have the rest of the boys that has been here.' He says, 'I can stand $30 per month to give to you boys, that will be fifteen apiece not to bother me when I have a game. I don't want you boys to run in on me without notifying me. If you will let me know I will have my gang all out or scattered out when you come in, and when you come in everything will be all right. Of course, I want you boys to do your duty.' There was other conversations between me and the defendant at this time. At this time I told him he would have to see my partner, that I would rather he would talk to him about it. 'Well,' he says, 'I can just give you the money, you and him can divide it, that is the way I have done all the rest of the boys that has been up here,' and, he says, 'You haven't heard of me having any trouble with them, have you?' And I said, 'Well, you will have to see my partner and whatever he agrees to it will be all right to me,' and he said, 'I am a little bit afraid of Lee,' that is my partner, Mr. Thompson, 'but I know you are all right.' I says, 'That may be true, too, Jim, but you will have to talk to Mr. Thompson about it,' and he insisted that I should take the money to let him run this crap game, and I would not do it, and told him I would have to see my partner, that I did not want to do anything without letting him know about it. That was all the conversation had that time. He at that time did not say

anything with reference to the sale of whisky and beer, but after Mr. Thompson came back from supper we sat down on the gallery and I related the circumstances to Mr. Thompson. . . . After Mr. Minter had made this offer to me and I had related it to Mr. Thompson like it had occurred, to be sure and make ourselves feel better we sent to see Mr. Bartlett, the police and fire commissioner, and intended to see the board of commissioners. (Objected to and sustained.) I talked to Commissioner Bartlett on the 4th, is my best recollection, and this was on the evening of the 3d, and the next day I saw the defendant was on the evening of the 4th. We began to work at 12 in the daytime and finished our work at 12 at night, and on the evening of the 4th, Mr. Minter, when we pulled our first box after 12 o'clock, was sitting on the gallery of a cold drink stand two blocks up the railroad from his place of business, and we turned around and walked down the street, going south on the Central Railroad, and he got up and followed us to his place of business, and from there we went around over our beat as usual. He did not say anything concerning the case at that time. We were both together and stayed together, so on the evening of the 5th we went up there a little after 12 o'clock and we had been after him about a bursted hydrant, and I walked up to where the hydrant had been bursted when Minter said, 'We have fixed the hydrant, now it ain't leaking'; and I said 'Yes,' and after some conversation he said, 'Have you seen your partner about this business?' I told him yes, I had talked to him; he said, 'What did he say?' 'Well,' I says, 'He will do whatever is right about it.' I didn't tell him what I thought was right about it. When I pulled the last box in the evening of the 4th, Minter was at the cold drink stand at the time I pulled the box, and I went off north and went ahead to the mouth of a little alley into Hall Street. Mr. Thompson went down the Central track to a building in the shape of a V, and in a few steps we separated and when Minter got to this little alley he stopped me again and says, 'Well, what does Thompson say about that?' and I says 'He is willing to do what is right about it, he will treat you right,' and he says, 'You just take the money and fix it with Thompson and everything will be all right,' and he made a motion and put his hand in his pocket, and I said, 'I can't do it, Jim, you will have to see Thompson and talk to him.' He says, 'You need not be a bit afraid of me, me and the chief are the best of friends and I will square this up with him. There is a dozen places on Main Street that is doing it,' and I said, 'I would not take advantage of my partner anyway, but whatever is all right with him is all right with me'; then I caught the car and he says, 'I will meet you here at this box at 8:30 or 8:40.' I says, 'All right.' We went right and pulled our 8 o'clock box and Minter was not there on the night of the 4th, so the next day, on the 5th, we went to report at the box near the same little drink stand when Minter walked up and said, 'Well, how does Lee feel about this matter?' I says, 'He feels all right, I think.' He said, 'I will just give you the money now, you can divide it with Lee or square it with Lee.' I told him I would not do it.

'You will have to see Mr. Thompson,' I says, and I turned my head and saw Thompson was coming up the railroad track about 75 or 100 feet from me, and I said, 'There comes Lee now, and you just speak to him about the matter, and whatever he wants to do I will do,' and he says, 'All right.' Lee walked to where we were. Minter says: 'Lee, we have just been talking about this money matter,' and he says, 'Well, Jim, what do you want us to let you do, to run a wide open gambling house and sell bootleg whisky and sell all the whisky you can?' Well, Minter studied and he says, 'I want you boys to do your duty.' So Lee told him, he says, 'That would be putting us in a kind of a close place if we were to do a thing like that,' and he says, 'No, you boys are dead safe. Don't worry about me, I have done all the men that worked this beat that way. I could square it with the chief of police, but it would cost me a little bit more. There is dozens of them on Main Street that is squaring it with him,' and he says, 'Jim, if you can square it with the chief of police that is the man for you to go and see,' and he says, 'No, I would rather give it to you boys just like I have the rest of them.' And he told us we would never have any trouble with him. I said, 'Whatever my partner wants to do about it is satisfactory to me.' Well, he says, 'One of you step in the little room (there was a little barber shop room about ten feet from where we were standing that had a chair in it, so if anybody came in for a shave the negro would come out of the confectionery stand and shave him). Now,' he says, 'one of you step in here with me and I will pay the $15 and then the other step in and I will pay him,' and I says, 'No, this is a good enough place, I don't see anyone near around here but just us,' and he says, 'Well, if you boys are a mind to you could make my tail warm for handing you this money in the presence of both of you.' I says, 'That is good enough right here.' He says, 'All right'; just run his hand down in his pocket, pulled out his money and he was standing between me and Mr. Thompson at the time and as he just turned around me—I was standing on the west side of him and Lee was down the curb from him, and he just slipped it to me and when he had I raised up in front of Mr. Thompson and he handed him a five and ten dollar bill and then I just turned around at that end, walked over and unlocked the box and Jim said, 'What are you fellows going to do?' and I said, 'We are going to lock you up'; and we locked him up in the City Hall and we filed charges against him. Q. Is that the money he gave you, $30? A. That is the sum, $30, that he gave us. There was a mark put upon it in the jury room. I put the marks on it. With reference to selling beer and whisky, he told us, as I said before, when Mr. Thompson asked him what do you expect of us, to let you run a blind tiger up there and gamble and sell whisky, he told us there was a game and not to run in on him when he had the game, and he said, 'I have got plenty of whisky here, if you boys want any you do not have to come to the place after it, let me know and I will furnish you with all you want and it won't cost you a cent.' . . . The way he put it to us, it was on anything he

might be doing not to arrest him or bother him, but to let him know and he would have the bunch out when we came in and everything would be all right. . . . Well, when we went there he had this booze up there; he had five kegs of Dallas Brewery beer in a little room locked up . . . and he had his whisky there behind the bar, that is, whisky glasses. The same evening that we arrested him, after we came back from being down here, we had started by his place, to the west side of the building, into a negro pool hall; he called us and says, 'Come over here a minute,' and we walked over there; now, he said, 'You fellows have done me a dirty trick,' and, he says 'I want you to distinctly understand, stay off of my premises, don't come in my place of business.' I says, 'Man, what are you talking about?' I says, 'You are running a public place, ain't you?' Now, I says, 'If you think you can keep us out of a public place, go ahead; we were sent up here to work this beat and we are going to do it, if you have to leave here,' and we found this booze that I have mentioned heretofore, and under the end of the bar, the south end of the bar, there were two kegs on tap; all you had to do was to turn the faucet. The court: Two kegs of what? A. Dallas Brewery beer. Q. Was it beer capable of producing intoxication? A. Yes, sir. . . . We found two kegs of beer and had occasion to go around behind the bar, and I investigated this particular corner. It was a closed box and if you did not know it or did not suspicion it or look at it you would not know there was any beer in there. It was a closed box under the south end of the bar, and I found these two kegs there and the faucet tapped. Found some small size whisky glasses and also beer glasses there; regular set of bar fixtures. Found some whisky but I did not taste it. There were about eight—ten or a dozen whisky glasses and seven or eight beer glasses sitting on the bar. I also saw five kegs of beer in a little back room right at the rear of the building where the bar was. It was the same building in which I afterwards had a conference with Minter in which he told me to keep out of his place of business. He was sitting in a chair right by the corner, leaning back against this building where all of this originated when he told us to keep off his premises and place of business, and just up at the rear at the back end they had doors and there were holes that had cork in it and if you pushed the cork out you could see plainly the five kegs sitting in there with ice all over the tops. I knew some of the colored men that worked around there, a negro by the name of John Forrest that worked there; one named Wynn; one named Green, and one named Geo. Milam. I saw a Federal license which was tacked up behind the south wall. Within a few hours after we arrested Minter we had a conversation with him in which he told us never to come into his house; that was the last time I remember talking to him. All he told I have stated. This is out of the saloon limits in the dry district."

The State then introduced in evidence the said money. It was thoroughly identified as the same that was handed by appellant to said witness Joe Davis and was shown to be lawful current money of the United States of America.

Cross-examination: "I encouraged the appointment of John Ryan as chief of police. We have been the very best of friends for years. I was not ambitious to be promoted from patrolman, only sought the assistance of my friends for the purpose of being promoted in this way. I said if a man was entitled to it that he ought to have it, and I think I ought to have a little bit better job than what I got, and if they did not see fit to give it to me it was satisfactory. It never occurred to my mind to be chief of police, and I was not ambitious to be such. I did not report to John Ryan, the chief of police, what the defendant told me about that he could square it with the chief of police as testified about in my direct testimony. I reported it to Mr. Bartlett, the police commissioner. I looked at it that he has the nomination and control of the appointment of the chief of police. I can not say positively whether I saw the Federal license I testified about before or after Minter's arrest, but it was something along about the first part of August up until the 6th or 8th. I looked at the license and saw that it was made out in the name of Brewer, if I am not mistaken, the initials were J. B. Brewer." Here the witness was handed a license to inspect, and he testified: "I would not swear whether it was the same one or not, but I could swear that it is the same name as was on the license I looked at. The number and street indicated on the license is 3121 Cochran Street, where the place of business was. I do not remember whether it was at a time during the year after the license was issued or before the date of the expiration of that license. I saw it in August between the 1st of August and 6th or 7th in 1911. From its face that license was issued July 3, 1911. I could not say that I see any difference in any way between this license and the license I saw on that occasion. I do not detect any difference and it bears the same name of J. B. Brewer. I never looked at any bill while I was inspecting the property at 3121 Cochran Street about the 4th or 5th of August, 1911, when I saw the United States license and beer and whisky and did not see any bill. I do not know J. B. Brewer and do not know that such a man existed. I mentioned to the jury that I inquired for such a man and was not able to find a man by that name. I found a man by the name of C. W. Cullen; I know him very well. I did not have a warrant issued for one J. B. Brewer. I did not cease in trying to locate a man by the name of J. B. Brewer whose bond had been forfeited in the County Court at Law of Dallas County, but I was not able to find him. I do not know that I asked any police officer, either predecessor of mine or otherwise about J. B. Brewer. I do not recall whether I did or not, but I asked a number in that neighborhood if they knew J. B. Brewer. I testified in the examining trial on the 15th day of August, 1911, somewhere around either nine or ten days after I arrested the defendant. My memory was then sharper about the transaction than it is now. I testified about the facts as I understood them. I think I testified in these very words on the examining trial, if I am not mistaken about it. That in the first conference had with this defendant he told me that he wanted to run a

crap game up there and what he wanted me to do was to notify him and he would get the crowd out of the way. . . . I reported in and turned, around . . . and when I turned around Minter says, 'I would like to run a little game up there,' and he says, 'How about fixing you boys?' and I says, 'Fixing us how?' and he says, 'I can give you $30 a month to let me run up here, I want to run a little game,' and I told him that I didn't know, that I would have to consult my partner, Mr. Thompson. . . . On that occasion he never offered us any money at all. He never pulled any out of his pocket. I do not know whether he had his hand in his pocket or out of it. There were three conferences pulled off before we accepted the money, and during one of these conferences he did put his hand in his pocket. I would not say whether he did or not put his hand in his pocket in the first conference on the evening of the 3d, but if it is in that writing there, I testified to it then. I did not ask Minter in the conversation in which Mr. Thompson was present and in which I said defendant told me that he could fix it with the chief of police, and Mr. Thompson said that was the man to go and see; whether or not he had the exact change, I never asked him anything and I am sure about it. I did not testify on the examining trial as follows: 'Mr. Thompson says to him that is the man for you to go and see. That is the man for you to see.' He did not say, either. He answered that he would rather give it to the men on the beat, and I did not testify either on the examining trial as follows: 'I asked him if he had the exact change. I do not remember what he did say, whether he had the exact change or not.' I am certain that I did not so testify. When Lee asked the defendant, 'Now, what do you expect us to do?' he told us in that conversation that he wanted us to do our duty, and it is true that the only thing he answered when Lee Thompson asked him, 'What do you expect us to do?' that his only answer was, 'Of course, I want you boys to do your duty.' I was examined at the examining trial by counsel for the State and cross-examined by counsel for defendant. Mr. Walter Seay was counsel in cross-examining me. I am pretty sure I said at the examining trial, if I did not overlook it, about the defendant saying anything about keeping off his premises. I testified that he ordered us to stay away from his premises. If I am not mistaken I so testified at the examining trial. I would be more likely to think of things nine days after it happened than months after. Q. Now, you and Lee Thompson, after the conversation, you agreed between yourselves that you would carry the matter on to a point where you would get him to deliver the money to you and then arrest him? A. We did not try to get him to do anything. He did it himself. We knew what we would have to swear against, and we would not accept it single. If we were to be bribed, we were both to be bribed; $15 apiece he said that is what he had been paying all of them. I accepted the $15 but Mr. Minter was standing between us. The $30 was given to both of us. We agreed to take the money together, that is, Thompson and I, not separate. This is all we agreed upon. We dis-

cussed the matter that the way to make the case was to get him to offer us the money together and not separately. It was our judgment in the case that unless the money was delivered to myself and Thompson we could not make out a case against him. We knew it was as much against the law to bribe as to accept it. At no time was there any other person present except myself and Lee Thompson and Minter, and these are the only three witnesses in the world to that occurrence, and no one else did see or could have seen or heard this matter. I am absolutely sure."

Lee Thompson testified: "I am a policeman and have been one off and on for ten or eleven years, and am now a policeman in the City of Dallas, Dallas County, Texas, and am a partner of Joe Davis. I know Jim Minter. I have talked to him about a bribe. It was about noon of the 5th of the month, Joe Davis, himself and I were present. I met Mr. Minter and Mr. Davis at the corner of Hall and the Central Railroad a little after noon that day, and he broached me on the subject. I forget the words, anyway, we met there and the subject came up in regard to this money, and I told Mr. Minter that I did not know about that, that I was a little bit shaky on that proposition, or something to that effect. Anyway, I asked him if that was the best he could do, that that was a mighty little money, and I told him I thought he ought to do better than that, and he says, 'That is what the other boys have been taking,' and I says, 'You ought to do better than that, Jim; what do you expect to do?' He hesitated a moment, and I said, 'You expect us to let you run a game?' and he said, 'You boys go and do your duty.' He says, 'Don't run in on me. Give me a chance and I will scatter. 'Joe,' I think he says, he says, 'Joe, come on and I will get the money,' and Joe says, 'Give it to us right here,' and I says, 'Yes, don't go away from here, we will take it here the same as anywhere else.' It throwed me between them, but we were all in a bunch. He just walked up to Mr. Davis and put his hand in his pocket like this and stuck it out like that, a five and ten and a ten and a five, and Joe turned it so I could see it. I said, 'Just consider yourself under arrest right now. You have gotten yourself in the same fix you wanted to put us in.'"

Cross-examination: "There was something said about change. I am not sure that Joe asked him if he had the exact change, but there was some remark made in regard to change. I didn't really expect he would do a thing of that kind, come in a manner that way. It come very much in the way Joe and I had talked over the matter about how we would bring it about. We had agreed that we would both be together when we got him to deliver the money to us. Minter did not say that there was $15 apiece for us, $15 each, we was together and he only handed it to one of us. He did not say, 'I will take you in a little barber shop and give you your $15 and then take Joe in and give him $15,' as there was not any barber shop there. It was the understanding, however, that he was to bribe both of us and we expected both to get the money or be present if it was gotten at all."

The State proved by other witnesses and deputy sheriffs that shortly

prior to this alleged bribery appellant, at said designated place, practically run a saloon there; that he had whisky and beer and whisky and beer glasses and the paraphernalia in connection with a saloon; that said place was raided by said officers and they found all this in his said place. By other witnesses it was shown that just before the time of this bribery they bought beer from appellant at that place and that the beer was intoxicating; that they bought it in bottles and in buckets and, in effect, that appellant kept it there regularly on tap for sale.

It was admitted by both sides on the trial that the City of Dallas was non-local option territory and that appellant's said place of business was outside of the saloon limits of the City of Dallas, and that a saloon license could not issue under the laws of the city to operate a saloon at that place; that appellant's said place was in the City of Dallas, outside of the said saloon limits; that in the charter of said city there are certain limits prescribed where saloons may run and where license may be issued, but that this place was outside of the said saloon limits and no sale of liquor at retail could obtain at that place.

The question of who is an accomplice and what it takes to make an accomplice is not always kept clear by our decisions. The cases are frequently indiscriminately cited on this subject. In speaking of accomplices and in treating of it in this case, we do it in its broadest sense,—that is, to include principals, accomplices as such, and accessories.

There are two rules on this subject as clear and distinct as can be. One is: An accomplice is a person who, knowingly, voluntarily and with common intent with the principal offender, unites in the commission of the crime.

The other is tersely stated by this court in Bush v. State, 151 S. W. Rep., 556, in substance: Where an officer or other party understands or is led to believe that a violation of the law is in contemplation and takes steps to detect that crime, or get evidence by which the guilty party may be punished, he would not be an accomplice. In such case he is not an original party to the bringing about the crime and is not guilty of originating or initiating it. In that character of case his connection with it is after the inception of the crime and after it has been determined upon and he only then gets into it as a detective or for the purpose of arresting the party and bringing him to punishment.

In the case of Allison v. State, 14 Texas Crim. App., 122, this court, through Presiding Judge White, said:

"From the evidence before us it does not appear that the witness. Massey was an accomplice. He had been informed by defendant of his (defendant's) intention to steal Justice's horse, and he immediately told Justice's sons, and Justice himself subsequently of defendant's intention. It is true that Justice and Massey then arranged that Justice should have his horse at a certain place, doubtless with a view that they might capture defendant in the very act of committing the theft, and it is inferable that there was a further understanding between the parties

that Massey was to accompany the defendant to the place and at the time when the theft was to be committed, ostensibly as his confederate, but in fact that he might aid in his arrest after the crime was consummated. Had this agreement been carried out, and the horse stolen at the time, place and under these circumstances mentioned, Massey, in law, would not have been an accomplice in the theft. (Pigg v. State, 43 Texas, 108; Johnson v. State, 3 Texas Crim. App., 590.)

"But this agreement was not carried out, and the horse was stolen on another occasion and in a different place. Instead of being an accomplice, it appears to us from the evidence that Massey acted throughout the part of a law-abiding citizen who, knowing that a crime was about to be committed, did, or was willing to do, all in his power to prevent it or bring its perpetrator to punishment. There was no occasion for the court to charge the law with regard to accomplice testimony in this case."

In Chitister v. State, 33 Texas Crim. Rep., 635, Presiding Judge Davidson, in discussing whether or not a witness in that case was an accomplice, for the court, said:

"That he (the witness) induced appellant to give him property to secure his departure from the State in order to be rid of his testimony did not, of itself, constitute the witness Crowley an accessory. In order to render the witness an accessory, he must have concealed the accused or given him some aid so that he may have evaded an arrest or trial, or the execution of his sentence. Penal Code, art. 86. This was not done. The witness did accept the property, and also agreed to leave the State. He, however, did not leave the State, and it is shown that he sought the bribe as a means of securing testimony for the purpose of convicting appellant for the theft of the animal set out in the indictment. He was active in the prosecution of the case, and testified in behalf of the State on the trial. This evidence did not require a charge upon the law applicable to accomplice testimony, and the court did not err in failing to so charge."

In Wharton's Crim. Ev., vol. 1, in sec. 440 (10 Ed.), he says: "An accomplice is a person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of the crime. . . . There are certain relations recognized by the law, in which the voluntary co-operation of a person with the accused does not render such person an accomplice. Thus, those who co-operate with a view to aid justice by detecting a crime, such as accepting money with which to purchase intoxicating liquors to obtain evidence of a violation of the law, for the purpose of prosecuting the seller for an unlawful sale, is not an accomplice; nor is an informer technically an accomplice; nor a detective who joins a criminal organization for the purpose of exposing it, even though, to aid such exposure he unites in and apparently approves its counsels; nor the agent who purchases a libelous publication for the purpose of giving evidence against the publisher; nor a disguised emis-

sary who, by purporting to be a friend of the parties suspected, seeks to draw from them inculpatory information."

In 4 Enc. of Ev., p. 630, the law on this subject is thus stated: "The fact that a detective in securing evidence of a crime is the instrument or means through which the law is violated does not make him an accomplice within the rule requiring the testimony of accomplices to be corroborated. Thus one who purchases liquor sold in violation of law for the purpose of securing the conviction of the offender is not an accomplice, nor is one who receives a counterfeit, or stolen goods, or buys a lottery ticket, or participates in a gambling game for the same purpose.

"So, also, one who pretends to be an accomplice, and apparently assists in the preparations for a crime with the purpose and intention of frustrating the design of the guilty parties and securing their punishment is not an accomplice whose testimony requires corroboration, even though he actually takes an apparent part in the commission of the offense."

In the recent work of Mr. Underhill (2 Ed.) on Crim. Ev., in section 69, he says: "A person who, as a detective, associates with criminals or communicates with or aids them solely for the purpose of discovering commission of crime, and procuring the punishment of the criminals, is not an accomplice."

In 12 Cyc., p. 447, the rule is thus laid down: "One who, as a detective, associates with criminals solely for the purpose of discovering and making known their crimes and who acts throughout with this purpose, and without any criminal intent, is not an accomplice, and it is immaterial that he encourages or aids in the commission of the crime."

It is needless to cite other authorities along this line. The books are full of them. There is not, and can not be, any doubt as to the correctness of the rule, and the application of it in the case.

In this case the evidence we have given above, in our opinion, demonstrates that the witnesses Joe Davis and Lee Thompson, the policemen, are strictly within this rule and were not accomplices. The testimony excludes the idea that they were. One test is, was the evidence sufficient to justify their indictment or conviction as an accomplice? No honest grand jury would or could have indicted either or both of these officers on this testimony. No court would for one moment on trial, submit to the jury for a finding their guilt or the guilt of either of them if they had been indicted and tried as accomplices, or principals in this crime of bribery on this testimony. A peremptory instruction would have been given to acquit them, even if any grand jury had ever indicted them and they were tried on this evidence.

In appellant's brief and argument in this case, the case of Dever v. State, 37 Texas Crim. Rep., 396, was pressed with the utmost vigor and it was claimed that the opinion in this case was in direct conflict with that. We have in connection with this case, and many times recently, had occasion to study and cite the Dever case. In our opinion there is

no conflict whatever between this case and the Dever case. In the recent case of Holmes v. State, decided April 23d, this court pointed out some of the distinguishing features of the Dever case, and, we think, made it clear that it has no application to this, as it had none in the Holmes case. In the Dever case it was demonstrated that the witness Mayfield was an accomplice by actual participation in the crime with the intent to do so and to get a reward. In this case we think the evidence demonstrates the reverse of this, and that neither of the witnesses, Davis or Thompson, had any intent whatever to participate or unite with appellant in the commission of the crime; but, on the contrary, all that they said to appellant, or did in connection therewith, was solely for the purpose of procuring the evidence against him to secure his conviction and that this was their sole purpose and intent.

On the other question of appellant's contention, that it is a legal impossibility for one man to commit bribery; that there must be the giver and the acceptor with corrupt purpose and intent of the bribe to constitute the offense, we have but little further to say.

The guilt of an accused is not measured by the intent of another but by his own intent.

Appellant has cited no authority to sustain his position other than the statute and the case of Newman v. People, 47 Pac. Rep., 278, a case decided by the Supreme Court of Colorado. In that case that question was not an issue. The judge, in delivering the opinion, merely, as argument, stated: "To constitute bribery the act of at least two persons is essential,—that of him who gives and him who receives. The minds of the two must concur." We do not regard the Colorado case as authority and would not follow it, even if it were not in the face of reason and the decisions of other able courts cited and quoted in the original opinion herein.

In addition to this, our own court has repeatedly decided the same question precisely, in principle, and it is well established.

In the case of Mercer v. State, 17 Texas Crim. App., 452, wherein this court said it was ingeniously and ably argued by counsel for defendant that our statute defining incest in using the words, "carnally know each other," presupposes the *consent* of both parties and makes it necessary that they should mutually carnally know each other; that the offense will not be complete where the man only acts voluntarily in the illicit connection; but, to make the offense complete, both the man and the woman must have the carnal knowledge of each other mentally as well as bodily, the court, through Judge Willson, on this point in that case, said:

"But, in our opinion, the great weight of reason and of authority is against the doctrine announced in the authorities cited and contended for by counsel for defendant. Mr. Bishop says, in treating of this class of offenses: 'As every offense to be punishable must be voluntary, so in particular must be adultery. But alike in adultery and, it is believed, in fornication and in incest, where the crime consists in one's

unlawful carnal knowledge of another, it is immaterial whether the other participated under circumstances to incur guilt or not,—just as sodomy may be committed either with a responsible human being, or an irresponsible one, or a beast. Therefore, the same act of penetrating a woman who, for example, is too drunk to give consent, may be prosecuted either as rape or as adultery, at the election of the prosecuting power. There are cases which deny this, and hold that adultery, fornication and incest can be committed only with consenting persons, and what is rape can not be one of the others. But they are believed to proceed partly, and perhaps entirely, on special terms of statutes; certainly, in principle, they have no other just foundation.' (Bish. on Stat. Crimes, sec. 660.)

"In the case of The People v. Rouse, 2 Mich. N. P., 209, it was held upon a trial for incest, where the proof tended to show that the intercourse was forcible and against the will of the female,—the complaining witness,—with whom the intercourse was had, that the accused might be convicted for incest even if the jury should find that the force used was such as, under the circumstances, to amount to rape. In Raiford v. State, 68 Ga., 672, it was held that, in the perpetration of the crime of incest, there may be a certain force or power exerted, resulting from the age, relationship, or circumstances of the parties, which, nevertheless, may not amount to the violence necessary to constitute rape. In Alonzo v. State, 15 Texas Crim. App., 378, the question now before us was discussed and the authorities reviewed at some length, the conclusion arrived at and announced being adverse to the view contended for by defendant's counsel in this case. If our view of the law as enunciated in the last cited case be correct, and we believe it is, then that case is decisive of the question we have been discussing, and accordingly we hold that, notwithstanding the evidence in this case may show that the defendant committed rape upon his daughter, he may be prosecuted and convicted for incest; and that, to make him guilty of incest, it was not necessary that his daughter should have consented to his carnal knowledge of her. She might be entirely innocent of any crime, and yet he might be guilty of rape or incest, or both, by having carnal knowledge of her. We can see nothing in our statute defining the crimes of rape and of incest which militates against this view."

Again, this court in Alonzo v. State, 15 Texas Crim. App., 378, in discussing the same principle, in an adultery case wherein it was contended that where one party had been tried and acquitted of the offense, the other party could not be tried and convicted because it took the act of both to make the offense, and if one was not guilty the other could not be, this court, through Judge Willson, said:

"We can not give our assent to the doctrine of the above cited cases, nor to the reasoning upon which the same are founded. We think the reasoning of these decisions is based upon false premises and is fallacious. While it is true that, to constitute adultery, there must be a joint physical act, it is certainly not true that there must be a joint criminal

intent.  The bodies must concur in the act, but the minds may not. While the criminal intent may exist in the mind of one of the parties to the physical act, there may be no such intent in the mind of the other party.  One may be guilty, the other innocent, and yet the joint physical act necessary to constitute adultery may be complete.  Thus, if one of the parties was, at the time of committing the physical act, insane, certainly such party has committed no crime; but it certainly can not be contended that the other party, who was sane, has committed no crime. So, if one of the parties was mistaken as to a matter of fact, after exercising due care to ascertain the truth in relation to such fact, which fact, had it been true, would have rendered the alleged criminal act legal and innocent, the party so acting under such mistake of fact would be innocent of crime.  (Penal Code, art. 46; Watson v. State, 13 Texas Crim. App., 76.)  But suppose the other party was not mistaken as to such fact, but, on the contrary, well knew the true fact which rendered the connection illicit, would this party be regarded as guilty of no offense because the mistaken party was innocent?

"If the North Carolina rule is correct, it must apply also to fornication, bigamy and incest.  Now, suppose a father and his daughter are indicted for incestuous intercourse with each other.  Upon trial of the daughter it is conclusively proved that at the time of committing the physical act she was an idiot, or that she was wholly ignorant of the relationship existing between herself and her father, without any fault of hers; of course, in either of these cases she must be acquitted.  Would it not be monstrous to hold that because of her innocence—her acquittal—the beastly father must go unpunished for his unnatural crime? Such can not be the law, and such, we believe, is not the law as declared by the weight of authority."

And the court in that case cites the decisions and text-book writers abundantly, sustaining the opinion and principle decided in that case.

It is needless to cite other authorities on this point.  The motion is overruled.

*Overruled.*


DAVIDSON, PRESIDING JUDGE (dissenting).—There are several propositions in this case which my brethren have erroneously decided as I now and have always understood the law to be.  The decisions practically are all one way as I understood them.  There are several reversible errors presented by the record.  I do not care to enter into a discussion of any of these at any length.  The reporter will condense the propositions, especially with reference to the attack upon the indictment, and the question of the two witnesses for the State being accomplices as contained in appellant's brief and motions for new trial and rehearing.  The indictment is vicious and does not, in my judgment, charge an offense under the statute.  The reporter will condense the substance of the grounds alleged as to the insufficiency of that instrument and the authorities relied upon by appellant.  I desire further to say

there could be no question under the evidence of the State's witnesses that they are accomplices. They assisted in bringing about the alleged violation of the law and accepted the money tendered by appellant, and this is shown by their own evidence. The distinction between a detective ferreting out crime and the same party bringing about or instigating crime has been discussed in this State and the distinction drawn. The leading case is Dever v. State, 37 Texas Crim. Rep., 396. There are other cases cited in appellant's brief. The recent case of Bush v. State, 151 S. W. Rep., 554, also draws the distinction. It will be of no practical value for me to elaborate or discuss the question as appellant has done so ably and fully in his brief, which will be reported substantially by the reporter.

I respectfully, without going further into this matter, enter my dissent.